## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

BYRON JOHNSON and BRIAN TAYLOR,

                Plaintiffs,                     Case No. 2:25-CV-10570

v.                                      Hon. Brandy R. McMillion
                                          United States District Judge

KELLY SERVICES, INC.,

                Defendant.

_____ /

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION TO COMPEL ARBITRATION AND STAYING THE ACTION (ECF NO. 8)

Plaintiff Byron Johnson ("Johnson") and Brian Taylor ("Taylor") (collectively, "Plaintiffs") bring this discrimination and retaliation lawsuit against their former employer, Defendant Kelly Services, Inc. ("Kelly" or the "Company") for violations of 42 U.S.C. § 1981, the Michigan Elliott-Larsen Civil Rights Act ("ELCRA"), and Title VII of the Civil Rights Act of 1964. *See generally* ECF Nos. 1, 14.[1] Currently before the Court is Kelly's Motion to Compel Arbitration. ECF No. 8. The Motion has been adequately briefed so the Court will rule without a hearing. *See* ECF Nos. 9, 11; E.D. Mich. LR 7.1(f)(2). For the reasons explained

---

[1] The Compliant was originally filed on February 28, 2025, but amended on September 15, 2025 to include the Title VII claim after receiving a Right to Sue Letter from the Equal Employment Opportunity Commission ("EEOC"). *See* ECF Nos. 1, 14.

below, the Court **GRANTS** Defendant's Motion to Compel Arbitration (ECF No. 8), **COMPELS** the Parties to arbitrate all claims, and **STAYS** the action pending completion of arbitration.

## I.

Around June 1, 2002, Johnson began working for Kelly.  ECF No. 1, PageID.3.  Johnson worked for the company for over 22 years and last held the position of Senior Service Manager while working in Atlanta, Georgia.  *Id*.  Taylor began his employment with Kelly around May 1, 2023.  *Id*.  Taylor worked in North Carolina and last held the position of Account Manager.  *Id.*  Both, Johnson and Taylor, identify as African-American men.  *Id*. at PageID.2.

In February 2024, the Mecklenburg County Department of Health (the "Department") contacted Taylor and requested information such as names, addresses, birthdates, and telephone numbers of all Kelly employees who were potentially impacted by a possible tuberculosis outbreak (the "Requests") at Bic Corporation's facility—one of Kelly's largest customers.  *Id*. at PageID.4.  Carrie McCrillis ("McCrillis"), Kelly's Account Director and Taylor's manager, previously told Taylor that Johnson was the "go-to-person" for any inquires to generate reports. *Id*. at PageID.3-4.  So in March 2024, Taylor requested Johnson provide him with the information the Department requested.  *Id*. at PageID.4-5.

Neither Taylor nor Johnson had prior experience with this type of Request. *Id*. at PageID.5. The Department followed up several times for additional and complete information, so Taylor and Johnson reached out to other Company employees for assistance. Ultimately, three other Kelly employees—Jesse Worrell ("Worrell"), Nickolas Kowalczyk ("Kowalczyk"), and Pinakin Patel—had to assist in completing the Department's Request. *Id*. at PageID.5-7. The Complaint underscores that Worrell and Kowalczyk are both Caucasian. *Id*. at PageID.5-6.

On May 2, 2024, Ashley Rahimpour ("Rahimpour"), Kelly's Human Resources Advisor, contacted McCrillis, Johnson, and Taylor, asking that they email Rahimpour the Requests from Department. *Id*. at PageID.7. Rahimpour also questioned Plaintiffs about who from the Company's Legal team authorized them to disclose full birthdates of Kelly employees to the Department. *Id*. On the same day, McCrillis laughingly asked Taylor, "Are our two black guys gonna get locked up?" *Id*. Johnson overheard the comment and reported it to Kelly's Vice President of Operations, Christie Santangelo, who is also Johnson's manager. *Id*. at PageID.3, 7-8. Shortly thereafter, on May 8, 2024, Plaintiffs received an email from the Company's HR department, requesting an email memorializing McCrillis' alleged slur. *Id*. at PageID.8. On May 9, 2024, the Company terminated Johnson and Taylor's employment for "violating a specific provision of Kelly's Code of Ethics: 'We are responsible for our actions, outcomes, and reputation.'" *Id*.

Despite being two of at least four individuals involved in responding to the Department's Requests, Plaintiffs—the only two African-Americans—were the only ones terminated. *Id*. As a result, on October 31, 2024, Plaintiffs filed a Title VII claim with the EEOC against Kelly. *Id*. at PageID.9. On February 28, 2025, this action followed. *See* ECF No. 1. The Complaint originally included claims for violations of 42 U.S.C. § 1981 and ELCRA but was amended to include Plaintiff's Title VII claims after the EEOC issued a right to sue. *See* ECF No. 14. In lieu of answering the Complaint, Defendant filed this Motion to Compel Arbitration and Stay the Action. ECF No. 8.

Defendant argues that Taylor entered into a "DISPUTE RESOLUTION AND MUTUAL AGREEMENT TO BINDING ARBITRATION" (the "Arbitration Agreement" or the "Agreement") when he signed the written agreement at the start of his employment with Kelly in April 2023. ECF No. 8; PageID.38. Defendant also alleges Johnson entered into the same Agreement on November 8, 2022, when he used a unique ID and password to complete the "Mutual Agreement to Arbitrate Disputes - all but California 2022" training, "Acknowledged" his completion of the training, then continued his employment at Kelly. *Id*.

The agreement states in relevant part:

> 1.    **Agreement to arbitrate**. Kelly Services, Inc.
> and its subsidiaries ("Kelly" or "Kelly Services")
> and I agree to use binding arbitration, instead of

going to court, for any "Covered Claims" that arise between me and Kelly Services, its related and affiliated companies, any current or former employee of Kelly Services or any related or affiliated company and/or its clients or customers. I understand and agree that this Agreement is intended by the parties to be enforceable by me and Kelly, and the rights and obligations under this Agreement directly apply to and benefit me and Kelly Services, Inc. and its subsidiaries, regardless of which of those entities signs this Agreement. This Agreement will survive and apply to any and all periods of employment or re-employment with Kelly Services. This Agreement is not mandatory for people who reside or work in California, and if I work or reside in California, I understand that the decision to sign this Agreement to Arbitrate is entirely my own, and that neither my hiring nor continued employment with Kelly is conditioned upon signing this Agreement to Arbitrate.

ECF No. 8-2, PageID.57. As a result, Defendant requests the Court compel the Parties to arbitrate Plaintiffs' claims and stay this case until arbitration is concluded. ECF No. 8, PageID.27. The Parties have adequately briefed the Motion so the Court will rule without a hearing. *See* ECF No. 8-9, 11; E.D. Mich. LR 7.1(f)(2).

## II.

The Federal Arbitration Act ("FAA" or the "Act") governs arbitration agreements. 9 U.S.C. § 1 *et seq*. Under Section 2 of the Act, "[a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid,

irrevocable, and enforceable," unless there are legal or equitable grounds "for the revocation of any contract . . ." 9 U.S.C. § 2. Thus, "arbitration agreements [are] on an equal footing with other contracts" and courts must "enforce them according to their terms." *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 67-68 (2010) (internal citations omitted). Because of this "duty to interpret [an arbitration] agreement and to determine whether the parties intended to arbitrate grievances concerning a particular matter," the court must "rigorously enforce agreements to arbitrate." *Nealy v. Shelly & Sands, Inc*., 852 F. App'x 879, 881 (6th Cir. 2021) (internal citations omitted).

Under Section 4 of the FAA, "'[i]f the making of the arbitration agreement . . . be in issue, the court shall proceed summarily to the trial thereof.'" *In re StockX Customer Data Sec. Breach Litig.*, 19 F.4th 873, 880-81 (6th Cir. 2021) (quoting 9 U.S.C. § 4). The Court applies a standard analogous to summary judgment to determine whether the existence of an agreement is "in issue." *Boykin v. Fam. Dollar Stores of Michigan, LLC*, 3 F.4th 832, 838 (6th Cir. 2021) ("The question whether the party opposing arbitration has put the making of the arbitration contract 'in issue' looks a lot like the question whether a party has raised a 'genuine issue as to any material fact.' Fed. R. Civ. P. 56(c) (1938). So we and many courts have held that Rule 56's standards govern whether a court should hold a trial under § 4 when a party alleges that no contract exists.").

A defendant "must initially carry its burden to produce evidence that would allow a reasonable jury to find that a contract exists" based on "ordinary state-law principles." *In re StockX.*, 19 F.4th at 881; *see also First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) ("[w]hen deciding whether the parties agreed to arbitrate a certain matter [. . .] courts [. . .] should apply ordinary state-law principles that govern the formation of contracts."). However, even if a party's claims are subject to arbitration, the Court must ensure "the arbitration agreement does not waive the substantive rights and remedies of the statute, and the arbitration procedures are fair so that the employee may effectively vindicate his statutory rights." *Williams v. Serra Chevrolet Auto., LLC*, No. 2:12-cv-11756, 2013 WL 183942, at *2 (E.D. Mich. Jan. 17, 2013).

If the Court finds that a valid arbitration agreement does exist, it will turn to its scope and resolve "any doubts concerning the scope of arbitrable issues" "in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983); *Fromm v. Meemic Ins.*, 690 N.W.2d 528, 531 (Mich. Ct. App. 2004). This is especially the case for arbitration agreements with "extremely broad" clauses. *Nestle Waters N. Am., Inc. v. Bollman*, 505 F.3d 498, 505 (6th Cir. 2007) (quotation omitted).

**III.**

Under the FAA, to compel a party to arbitration, the Court must determine the scope of the parties' arbitration agreement to ensure the claims are "in accordance with the terms of the arbitration agreement;" consider whether Congress intended any federal statutory claims raised to be non-arbitrable; and determine that the parties agreed to arbitrate. 9 U.S.C. § 4. At the outset, the Court concludes that the Arbitration Agreements cover all the claims that Plaintiffs assert in the Complaint. *See* ECF No. 8-2, PageID.57, 61 (Section 2 requires arbitration of "all common-law and statutory claims relating to my employment, including, but not limited to, any claim for … violation of laws ***forbidding discrimination***, harassment, and retaliation on the basis of race…") (emphasis added). Moreover, Congress did not intend any of Plaintiffs' federal statutory claims (42 U.S.C. §1981, Title VII) to be non-arbitrable. *See ShaZor Logistics, LLC v. Amazon.com, LLC*, 628 F. Supp. 3d 708, 713 (E.D. Mich 2002); *Cooper v. MRM Inv. Co.*, 367 F.3d 493, 509 (6th Cir. 2004). Therefore, Kelly is entitled to an order compelling arbitration so long as the Parties agreed to arbitrate, or in other words, the arbitration provision is valid and enforceable.

In its request to compel arbitration, Kelly argues: (1) Johnson is bound to arbitration because he completed an arbitration training and continued his employment with the Company, (2) Taylor is bound to arbitration under a signed, written agreement, and (3) all of Plaintiffs' claims—including their ELCRA

claims—are subject to arbitration.  *See* ECF No. 8., PageID.42-48.  Based on these arguments, under § 4 of the FAA, this puts the "making of the agreement in issue." *See Memmer v. United Wholesale Mortg.*, No. 23-CV-11261, 2023 WL 8818298, at *3 (E.D. Mich. Dec. 18, 2023) (citing *Great Earth Cos., Inc. v. Simons*, 288 F.3d 878, 889 (6th Cir. 2002)) (internal quotations omitted).[2]  So, the Court will address each of the arguments in turn.

## A.    Johnson's Arbitration Agreement with Kelly

In response to this motion, Johnson argues that completion of a training module does not constitute assent to a valid and enforceable contract, especially when the agreement is unsigned and there was no notice that completion of a training module would manifest assent to arbitrate.  *See* ECF No. 9, PageID.83-86.  The Court disagrees.

Parties to an arbitration agreement have mutuality of agreement when there is "a 'meeting of the minds' on all the essential elements of the agreement."  *In re StockX*, 19 F.4th at 881 (quoting *Huntington Nat'l Bank v. Daniel J. Aronoff Living Trust*, 853 N.W.2d 481, 488 (2014)) (cleaned up).  Even if a party did not sign an

---

[2] In this case, Michigan law applies to the interpretation of the contractual claims, including the validity of the Arbitration Agreements. *First Options of Chicago*, 514 U.S. at 944; *see also* ECF No. 8-2 PageID.57.  Under Michigan law, a valid contract "requires five elements: (1) parties competent to contract, (2) a proper subject matter, (3) legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation." *In re StockX*, 19 F.4th at 881 (quoting *AFT Mich. v. State*, 866 N.W.2d 782, 804 (Mich. 2015)).

arbitration agreement in the traditional sense, an attestation such as "clicking 'Acknowledge'" can suffice. *Brown v. Heartland Emp. Servs., LLC*, No. 2:19-cv-11603, 2020 WL 2542009, at *4 (E.D. Mich. May 19, 2020). Here, Plaintiffs conflate assenting to a contract with signing an agreement. *See* ECF No. 9, PageID.84-85. A binding arbitration agreement does not require a party's signature. *See Hudson-Swoop v. MRO Corp.*, 773 F. Supp. 3d 546, 561 (N.D. Ohio 2025) (citation omitted); *accord Higgs v. Automotive Warranty Corp. of Am.*, 134 F. App'x 828, 831 (6th Cir. 2005). That Johnson did not physically sign the Agreement is not dispositive because he did in fact log into Kelly's system with a unique user ID and password and acknowledged the Arbitration Agreement on November 8, 2022. *See* ECF No. 8-2, PageID.54-55.

The question then becomes whether an action such as continuing one's employment can constitute acceptance. And the Court finds that it does because the Sixth Circuit does not require a party's intent to bind themselves to the terms of an agreement in order for it to be valid and enforceable. *See Hardaway v. Aveanna Healthcare*, LLC, No. 2:23-cv-12246, 2024 WL 2271826, at *3 (E.D. Mich. May 20, 2024) (citing *Mazera v. Varsity Ford Mgmt. Servs., LLC*, 565 F.3d 997, 1002 (6th Cir. 2009)). Continued employment is sufficient consideration to validate an employment contract that includes an arbitration provision. *See Solomon v. CARite Corp. LLC*, 837 Fed. App'x 355, 362 (6th Cir. 2020) ("In Michigan, continued

employment is sufficient consideration to validate a contract in an at-will employment setting.") (quoting *Tillman v. Macy's Inc.*, 735 F.3d 453, 460 (6th Cir. 2013); *see also Seawright v. Am. Gen. Fin. Inc.*, 507 F.3d 967, 972 (6th Cir. 2007) (upholding arbitration agreement between employer and long-term employee who continued employment after effective date of arbitration program, finding the continued employment "constituted acceptance of a valid and enforceable contract to arbitrate."); *see also Dawson v. Rent-A-Center Inc.*, 490 F. App'x 727, 730 (6th Cir. 2012) (holding that even if there is no signed arbitration agreement, the employee can demonstrate his assent by continuing to work for the employer because "Michigan law permits parties to accept offers through conduct."). Similarly, here, Johnson's continued employment at Kelly, even after working there for many years prior, sufficiently constituted his assent to the Arbitration Agreement.

Plaintiffs next attempt to undermine the Arbitration Agreement based on a lack of consideration because nothing was allegedly "bargained for exchange." *See* ECF No. 9, PageID.86. But, "[i]n Michigan, continued employment is sufficient consideration to validate a contract in an at-will employment setting." *Solomon v. CARite Corp. LLC*, 837 F. App'x 355, 362 (6th Cir. 2020). Plaintiffs do not dispute Johnson continued his employment at Kelly after he completed the "Mutual

Agreement to Arbitrate Disputes - all but California 2022" training, nor dispute that he was an at-will employee. Thus, there was sufficient consideration.

According to Plaintiffs, "there is also a complete lack of consideration to enforce any agreement [because] Johnson was employed for 20 years prior to his completion of a five-minute training module." ECF No. 9, PageID.86. The Sixth Circuit has already addressed a similar timeframe in *Seawright*. There, plaintiff began working for the employer in 1978, and the relevant arbitration program became effective in 1999. That the employee had already worked at the company for nearly 21 years was still not enough to contest the existing contract to arbitrate. *Seawright*, 507 F.3d at 971. Similarly, Johnson's consideration is not undermined by his time spent at the Company prior to entering into the Agreement.

Plaintiffs also argue that the arbitration agreement is invalid based on lack of notice. *See* ECF No. 9, PageID.86-92. The Court finds this argument unpersuasive. Under Sixth Circuit precedent, notice such as the one Johnson received is satisfactory. *See Tillman*, 735 F.3d at 456-57 ("[E]mployer provided notice of roll-out of dispute resolution program through employee's attendance at mandatory meeting where she watched a video and was provided with informational brochure, and through mailings, electronic posting, mailed plan documents, and election forms which informed employee that arbitration was optional part of dispute resolution program[.]"). First, Johnson received the Agreement and second, the Company

required he complete and "Acknowledge" his completion of a training pertaining to that Agreement.  *See* ECF No. 8, PageID.55, 61-67.  Plaintiffs' contention that "[t]here is no reference anywhere in Ex. 1-C or 1-D to the Arbitration Agreement or any of its terms therein [... and t]here is also a lack of any reference to an agreement or promise to be bound to the Arbitration Agreement in either exhibit," without more, is not enough.  Employers need not provide perfect notice to bind employees into arbitration agreements.  *See, e.g., Brown v. Heartland Emp. Servs., LLC*, No. 2:19-cv-11603, 2020 WL 2542009, at *4 (E.D. Mich. May 19, 2020) ("[A]lthough [the plaintiff] denies clicking 'Acknowledge' knowing that the result would be to mandate arbitration, she does not deny clicking the button.").

Further, Plaintiffs assert that in *Hess v. Hallrich, Inc.*, No. 4:24-cv-77, 2024 WL 3860314, at *7 (N.D. Ohio Aug. 19, 2023), the Court found that "text messages showing employee completed an electronic onboarding process did nothing to establish the connection that employee saw or signed an arbitration agreement." ECF No. 9, PageID.88.  But in that case, the Court actually found that the "produced text messages from Hess during the time she returned to Pizza Hut [was not enough to] prove[...] Hess [performed] the electronic onboarding process." *Hess*, 2024 WL 3860314, at *7.  Here, however, Plaintiffs concede that Johnson completed the arbitration training module, which, coupled with the Agreement he received, is

enough to establish the connection that *Hess*-Defendants could not.  *See* ECF No. 9, PageID.86-92.

The Court therefore finds Kelly has carried its burden in showing a contract existed between it and Johnson.  And Johnon presents nothing to create a genuine issue of material fact to the existence of that Agreement.

**B.    Taylor's Arbitration Agreement with Kelly**

Taylor signed a written Agreement at the commencement of his employment with Kelly.  Plaintiffs do not deny Taylor signed the Agreement, rather, they assert it is invalid because the "provision requiring individualized arbitration [. . .] negates the fairness of the procedure[.]"  *See* ECF No. 9, PageID.95-96.  Specifically, they allege the Arbitration Agreement lacks procedural fairness because the following provision requires individualized arbitration:

> "8. Waiver of Class and Collective Claims.
>
> Both Kelly Services and I also agree that all claims subject to this agreement will be arbitrated only on an individual basis, and that both Kelly Services and I waive the right to participate in or receive money or any other relief from any class, collective, or representative proceeding. No party may bring a claim on behalf of other individuals, and no arbitrator hearing any claim under this agreement may: (i) combine more than one individual's claim or claims into a single case […]"

ECF No. 9, PageID.95.  Plaintiffs are correct; "when parties agree to arbitrate statutory antidiscrimination claims, they waive their right to seek relief in a judicial forum."  *See Kennedy v. Superior Printing Co.*, 215 F.3d 650, 653 (6th Cir. 2000).

14

However, Plaintiffs appear to misunderstand how the Court will analyze whether a waiver was known and voluntary. *See generally* ECF No. 9. Describing the provision as "run[ning] afoul with elementary procedural fairness," *see* ECF No. 9, PageID.82, is not enough for a finding that Taylor did not knowingly and voluntarily waive his rights to a judicial forum.

To correctly determine whether a plaintiff knowingly and voluntarily executed a waiver of the right to seek relief on an employment discrimination claim, the Court must evaluate "(1) plaintiff's experience, background, and education; (2) the amount of time the plaintiff had to consider whether to sign the waiver, including whether the employee had an opportunity to consult with a lawyer; (3) the clarity of the waiver; (4) consideration for the waiver; as well as (5) the totality of the circumstances."[3] *Williams v. Serra Chevrolet Auto., LLC*, No. 12-11756, 2013 WL 183942, at *2 (E.D. Mich. Jan. 17, 2013) (citing *Morrison v. Circuit City Stores, Inc.*, 317 F.3d 646, 653 (6th Cir. 2003)). Plaintiffs insist the Court should question the validity of Taylor's signed Arbitration Agreement with the Company to avoid "creating a risk that nearly identical claims would have inconsistent rulings." ECF No. 9, PageID.97. However, Plaintiffs fail to explain how this supposed risk satisfies any of the applicable factors. In the authority Plaintiffs cite, the Sixth

---

[3] Notably, Plaintiffs do not address any of these factors. *See* ECF No. 9, PageID.94-98.

Circuit clarified that "employees who **do not sign individual arbitration agreements** are free to sue collectively, and those who do sign individual arbitration agreements are not." *Gaffers v. Kelly Servs., Inc.*, 900 F.3d 293, 296 (6th Cir. 2018) (emphasis added).  Taylor in fact signed an individual arbitration agreement, thereby waiving his right to sue collectively.

## C.  The ELCRA Claims Are Arbitrable

Finally, the Court will address whether Plaintiffs' ELCRA claims are subject to mandatory arbitration while simultaneous appeals on related issues are currently before the Michigan Supreme Court.[4]  *See* ECF No. 8, PageID.42-45; *see* ECF No. 9, PageID.92-94.  Plaintiffs argue for the Court to stay this case pending the outcome of the appeals before the Michigan Supreme Court.[5]  The Court does not find a stay necessary; because it is well-settled that "the FAA preempts state laws and policies regarding arbitration."  *See Fazio v. Lehman Bros., Inc.*, 304 F.3d 386, 392-93 (6th Cir. 2003)."  When a state law tries to "prohibit[] outright the arbitration of a particular type of claim, the analysis is straightforward: The conflicting rule is displaced by the FAA."  *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 341

---

[4] *See Rayford v. Am. House Roseville I, LLC*, 991 N.W.2d 199 (2023); *Saidizand v. GoJet Airlines, LLC*, 991 N.W. 2d 208 (Mich. 2023)

[5] The Court notes that the Michigan Supreme Court issued an opinion in *Rayford v. Am. House Roseville I, LLC*, No. 163989, 2025 WL 2177754 (Mich. July 31, 2025), after the briefing on this motion.  Notably, that opinion does not address the issue of whether ELCRA claims can be the subject of mandatory arbitration provisions.

(2011).  That principle applies here.  In other words, even if, as Plaintiffs assert, "the Michigan Supreme Court is strongly considering striking mandatory arbitration for all claims under the ELCRA," *see* ECF No. 9, PageID.93, the FAA would preempt that decision, and Plaintiffs would still be compelled to arbitrate their ELCRA claims.  *See e.g.*, *Tucker v. United Wholesale Mortgage, Inc.*, No. 24-1595, 2025 WL 1082316, at *3 (6th Cir. Apr. 10, 2025) (declining plaintiff's request that the Court "hold the case in abeyance and wait for the Michigan Supreme Court to decide a pending case about whether 'claims under the Elliott-Larsen Civil Rights Act' 'may be subjected to mandatory arbitration as a condition of employment under Michigan law.'").

Thus, the Court denies Plaintiffs' request to stay a decision on Defendant's Motion to Compel Arbitration pending the resolution of *Rayford/Saidizand*, because either decision would be inconsequential with respect to whether the ELCRA claims must be arbitrated.

### IV.

Based on the foregoing, the Court finds that a reasonable jury could find that both Johnson and Taylor entered into valid and enforceable arbitration agreements; and Plaintiffs have failed to create a genuine dispute of material fact as to the validity of the agreements to arbitrate.  Therefore, an order compelling the Parties to arbitration is appropriate.  Further, having found that neither Agreement is invalid

17

based on a lack of procedural fairness, and that all the claims —including the ELCRA claims—must be arbitrated, the Court will stay this action and compel the Parties to arbitration.

Accordingly, Defendant's Motion to Compel Arbitration (ECF No. 8) is **GRANTED**, the Parties are **COMPELLED** to arbitrate the claims in dispute, and Plaintiffs' Complaint (ECF No. 1) is **STAYED** pending resolution of the arbitration.

**IT IS SO ORDERED.**

Dated: October 1, 2025                              /s/Brandy R. McMillion
       Detroit, Michigan                              Hon. Brandy R. McMillion
                                  United States District Judge